IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **BRAKE PARTS, INC.,** a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) Case No. _____ |
| vs. | ) ) ) Hon. _____ |
| **SATISFIED BRAKE PRODUCTS, INC.** a Canadian Corporation, and **ROBERT KAHAN**, an individual, | ) ) ) ) **Jury Trial Requested** |
| Defendants. | ) ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Brake Parts, Inc. ("BPI") brings this Complaint for Injunctive and Other Relief against Defendant Satisfied Brake Products Inc. ("Satisfied") and Defendant Robert Kahan ("Kahan") (collectively "Defendants"), and for its causes of action, BPI states as follows:

## NATURE OF THE ACTION

1.  This is an action brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as under Illinois statutory and common law, arising from Satisfied's and Kahan's theft and misuse of confidential BPI brake pad formulations, mechanisms and processes in the development and manufacture of brake pads.

2.  BPI is a leading manufacturer of brake products, including brake pads. Satisfied, a Canadian company, also competes in portions of the same market in which BPI sells its brake pads.

3.  In 2006, Satisfied and Kahan contacted a BPI employee, Dave Lewis ("Lewis"), to procure BPI's confidential formulas, mechanisms and processes for brake pad manufacturing through a clandestine arrangement. For Lewis' efforts, one of Satisfied's owners, Robert Kahan

("Kahan"), travelled to the United States and made a payment of cash to Lewis at an airport hotel in Kentucky.

4. Satisfied and Kahan have since used that information to manufacture brake pads based either in whole or in part on BPI's confidential brake pad formulations, mechanisms and processes, usurping the cost and time expended by BPI in the research and development of that information and providing Satisfied and Kahan with an improper head start and unfair position in the marketplace that they otherwise would not have had without such access.

## PARTIES, JURISDICTION AND VENUE

5. Plaintiff Brake Parts, Inc. is a Delaware corporation with its principal place of business in McHenry, Illinois. It is a subsidiary of Affinia Group, Inc., a privately held company incorporated in Delaware, with its principal place of business in Ann Arbor, Michigan.

6. Defendant Satisfied Brake Products Inc. is a Canadian Corporation with its principal place of business in Cornwall, Ontario.

7. Defendant Robert Kahan is a Canadian citizen, with his principal residency at 7 Mallard Rue, Dollard Des-Ormeaux, Québec. Kahan is the Executive Vice-President, and fifty-percent owner, of Satisfied.

8. Satisfied distributes its products directly into the United States through companies located throughout the United States, including within this district, and therefore purposefully avails itself of the benefits and protection of the laws of both the United States and Illinois.

9. This Court has original jurisdiction of this action under 28 U.S.C. § 1331 and 1332, as the matter involves an action arising under the laws of the United States and because the parties are citizens of different states and the matter in controversy exceeds $75,000.00, excluding interest and costs. This Court also has original jurisdiction of this action pursuant to

18 U.S.C. § 1964 as Satisfied is found and transacts its affairs in this District. This Court has supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Satisfied and Kahan and venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Satisfied and Kahan conduct business in this District, have committed tortious acts in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, Satisfied and Kahan have purposefully availed themselves of the laws of the State of Illinois, and BPI has been injured in this District.

## BACKGROUND

### The History of BPI and Raybestos® Brake Products

11. BPI designs and manufactures braking products for passenger cars, light trucks, heavy truck and bus, and off highway applications. Its brake pad products include disc brake pads, such as professional and service grade disc brake pads, and police patrol disc brake pads. BPI also provides brake shoes, rotors, drums, calipers, wheel cylinders, master cylinders, hoses and cables, and disc brake hardware axle kits.

12. Because brakes are one of the most vital systems to the safety of a vehicle, BPI invests heavily in its research and development of the entire brake system.

13. Through continuous research and development, BPI has set the benchmark for innovative and high quality brakes.

14. BPI sells its products under the brand name Raybestos®. Since 1902, Raybestos® brand brakes have been an industry leader, priding themselves on innovation, quality and safety.

15. Raybestos® brand products have been utilized for over a hundred years in numerous vehicles, including the Model "T", World War II tanks and trucks, and throughout the auto racing industry.

16. The Raybestos® brand became part of the Affinia Group, Inc. in 2004, after it acquired BPI from Dana Corporation.

17. Previously, in 1998, Dana Corporation had acquired the Raybestos® brand from Echlin, Inc.

18. As a result of the several acquisitions to create BPI, and to ensure the high-quality expected from the Raybestos® brand, BPI undertook extraordinary efforts to standardize the production of its brake products, creating standard specifications at one central location in the Winchester Research and Development Center, and then providing those specifications, through highly controlled and limited methods, to specific individuals at each BPI plant.

19. Through this standardization, BPI could manufacturer any one of its high-quality brake pads, made to meet specific needs, including: (1) Advanced Technology Disc Brake Pads; (2) Professional Grade Disc Brake Pads; (3) Service Grade Disc Brake Pads; and (4) Advance Technology Police Patrol Disc Brake Pads.

20. Within these families of products, product engineers work on different formulations and processes for specific types of vehicles, *e.g.*, light passenger vehicles.

21. Brake pads are steel backing plates with friction material bound to the surface facing the brake disk. Brake pad materials range from organic to semi-metallic formulations. Each of these materials provides advantages and disadvantages regarding environmental friendliness, wear, noise and stopping capability.

22. For example, while semi-metallic pads provide strength and conduct heat away from rotors, they also generate noise and create greater abrasiveness, resulting in increased rotor wear.

23. Thus, BPI expends great energy and resources in the creation of the appropriate formulation and mixture of elements and materials, through which BPI can manipulate and create the appropriate friction coefficient for the various grades of brake pads.

24. Another key aspect of the brake pad is the process used to manufacture the brake pad, involving different levels of pressure, heat and time.

25. The formulas, processes, bill of materials, standard operating procedures, and methods utilized to create the brake pads are proprietary and they are only available to select BPI employees.

26. BPI provides multiple levels of security to ensure that the formulas, processes, bill of materials, standard operating procedures, and methods utilized to create the brake pads remain proprietary and they are only available to select BPI employees.

27. The documents, such as log books and test results, are stored in a secure, central location, where access is limited only to those involved in the developmental efforts. The facility where these documents are stored requires both keyed access as well as entry of a security code. During non-business hours, the security system monitors which employee enters the facility by tracking the code entered into the system. The lobby and front-entrance of the facility are monitored by closed-captioned television. A non-BPI person may gain access to the facility only by signing into a log, and through identification through visual inspection by the BPI employee expecting the visitor.

5

28. As an extra measure of security to maintain the secrecy and confidentiality of these materials, BPI uses various code names and numbers so that, *e.g.*, the person handling the bulk materials only can identify those materials by a code, rather than gaining knowledge of the precise quantity and quality of the material being ordered. These codes are maintained and secured at the Winchester Facility.

29. Only a limited control group of individuals gain access to the meaning of these codes.

30. BPI further protects its information by requiring its personnel to sign agreements containing confidentiality covenants; limiting access to confidential information; utilizing computer passwords; limiting access to offices and documents; monitoring who is given access to confidential information; instructing personnel not to show any confidential information to clients or others outside BPI; and requiring all confidential and proprietary materials to be used for company purposes only.

31. BPI's proprietary information is not generally known in the industry and is valuable because BPI derives economic value from the information not being publicly available.

32. BPI's proprietary business and technical information is of great value to BPI and such information would give any competitor who improperly acquired such information a head start on development and an unfair competitive advantage.

**SATISFIED CONDUCTS VERY LIMITED RESEARCH AND DEVELOPMENT**

33. Satisfied operates from a small facility in Cornwall, Ontario, with limited personnel and limited testing facilities.

34. Upon information and belief, Satisfied invests little time, money or energy in conducting its own research for the brake products it sells.

6

35. Satisfied historically focused on lower-performance brake pads, known in the industry as the economy, as compared to premium, brake pads.

36. In recent years, however, Satisfied has begun to foray into the mid-grade to premium lines of brake pads

## LEWIS' WORK AT BPI

37. Lewis began working for Echlin Corporation in January 1992.

38. On January 15, 1996, Lewis entered into an "Invention and Disclosure Agreement" ("IDA"), attached hereto as Exhibit A.

39. The IDA requires Lewis, throughout his employment, to:

> treat as trade-secrets, hold in strongest confidence and not disclose directly or indirectly to any person, firm or corporation, without express authorization of the Corporation [BPI], during or subsequent to their employment by it, any information or data which the employee may acquire or which may come to their knowledge or attention with respect to any invention, design, manufacturing technique, process, system, formula, improvement, development or experimental work, work in process, or any other private or confidential matter relating to the products, or business of the corporation, its predecessors or successors in business, affiliates and subsidiaries, unless and until the same shall have been published and made available to the public.

40. Lewis' IDA requires that all materials relating to the operations, investigations and business are the property of BPI and must be surrendered upon termination of employment.

41. The IDA requires Lewis to also promptly disclose and assign any and all inventions, discoveries and designs to BPI.

42. The IDA explicitly recognizes that failure to abide by the terms of this agreement will result in irreparable injury and entitles BPI to injunctive relief.

43. In 1999, Lewis entered into a similar restrictive agreement with BPI, attached hereto as Exhibit B.

44. During the course of his employment, Lewis was entrusted with BPI's confidential and proprietary information. This information included, among other things: (1) technical data, (2) formulae, (3) logbooks for previous generations of brake parts, (4) test results performed on BPI brake parts, and (5) new product development.

45. This information was only entrusted to Lewis because of his explicit agreement to hold all such information in complete confidence and only use it for the benefit of BPI.

46. During his career with BPI, Lewis worked on the development and improvement of ceramic (non-ferrous) brake pads for passenger vehicles, creating various iterations of disc-pad friction formulation.

47. Thus, from the late 1990's until his termination, Lewis worked on creating a more cost-efficient brake pad, while simultaneously creating a "dust suppressed" (cleaner) and "quiet performance" (quieter) product.

48. As a result of this work, Lewis became well-known in the industry for his work on high-quality ceramic brake pads, and refers to himself as the "Godfather of Ceramics".

**THE ENTERPRISE CONDUCTED TO REMOVE BPI'S INFORMATION**

49. Throughout his employment at BPI, unbeknownst to BPI, Lewis maintained a relationship with Kahan, a principal and officer of Satisfied.

50. In 2006, Kahan used that relationship with Lewis to exploit knowledge, research and confidential information that Lewis had developed while working for BPI.

51. Specifically, in the late-summer of 2006, Kahan discussed having Lewis perform some technical assistance as a "consultant" for Satisfied, while still working for BPI.

52. At the time, Kahan knew and understood that Lewis was a BPI employee with obligations to BPI regarding confidentiality.

CH1 11839406.1

53. To facilitate the relationship, Kahan created an email account for Lewis that could not be traced directly to Lewis.

54. Using that email account, Kahan requested Lewis provide suggested formulations, processes and techniques for Satisfied to use in manufacturing brake pads.

55. Between September 2006 and December 2006, Lewis sent at least five letters to Kahan through interstate and foreign commerce using the Internet containing recommendations and suggestions on the manufacturing of brake pads.

56. In at least two of these letters, Lewis provided confidential formulations and processes which he was developing contemporaneously for BPI.

57. Kahan accepted this confidential information from Lewis, despite knowing that it constituted formulations and processes that had been developed for BPI, using BPI time and resources.

58. Kahan, on behalf of Satisfied, paid Lewis at least $8,000 cash for this information.

59. Initially, Lewis requested that Kahan wire payment for his services directly to his bank account.

60. Instead, in an effort to conceal any evidence of his illegal actions, Kahan travelled to the United States and met Lewis in an airport hotel in Kentucky.

61. At the hotel, Kahan paid Lewis in hundred-dollar bills, totaling at least $8,000.

62. Subsequent to the transmission by Lewis of this information, Kahan terminated the email account provided to Lewis for the transmission of the formulations and processes.

CH1 11839406.1

63. Upon information and belief, Satisfied has since used, and continues to use, the confidential and proprietary BPI information provided by Lewis to manufacture and improve upon its own line of brake pads.

## COUNT I

### Violation of Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*

64. BPI repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 63.

65. Satisfied's and Kahan's actions violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and specifically, 18 U.S.C. § 1962(c).

66. At all relevant times, BPI was and is a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

67. At all relevant times, Satisfied was and is a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

68. At all relevant times, Kahan was and is a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

69. In 2006, Lewis was uncertain about his future at BPI and sought to secure employment with Satisfied by assisting Satisfied and Kahan in improving and creating products based upon BPI's confidential and proprietary information.

70. In 2006, Satisfied and Kahan improperly sought the assistance of Lewis to improve upon products and create new products through the use of Lewis' knowledge of BPI's confidential and proprietary information.

10

71.     Satisfied, Kahan and Lewis, therefore, were a group of persons associated together for a common purpose of engaging in a course of conduct.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

72.     At all relevant times, the enterprise was used to carry out the illegal and fraudulent activities at issue in this Complaint.

73.     At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).  As described within the Complaint, Satisfied and Kahan perpetrated their fraudulent scheme to steal BPI's Confidential Information through the use of wire affecting interstate and foreign commerce.

74.     At all relevant times, Satisfied and Kahan conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1962(c).  The pattern of racketeering engaged in by Defendants involved a scheme whereby Defendants used fraud and artifice to unlawfully obtain BPI's Confidential Information to which they had no right.

75.     Specifically, each email transmission between Lewis, in Kentucky, and Satisfied and Kahan, in Canada, seeking, and providing, BPI's confidential and proprietary information constitutes a separate violation of 18 U.S.C. § 1343, which prohibits the use of wire in interstate or foreign commerce to further any scheme or artifice to defraud.

76.     Further, Satisfied and Kahan paid at least $8,000 for BPI's confidential and proprietary information which was transmitted from Lewis' home in Kentucky to Satisfied and Kahan in Canada, in violation of 18 U.S.C. §2315.

CH1 11839406.1

77.     Satisfied's and Kahan's acts in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2315 constitute a pattern of "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

78.     As a result of Satisfied's and Kahan's violation of RICO, 18 U.S.C. § 1962(c), BPI suffered damages in an amount to be determined at trial, including, but not limited to, the loss of the cost of development and proprietary use of the confidential information improperly procured by Satisfied and Kahan.

79.     Pursuant to RICO, 18 U.S.C. § 1964(c), BPI is entitled to recover threefold damages plus costs and attorneys' fees from Satisfied and Kahan.

## COUNT II

**ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS**
(Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.*)

80.     BPI repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 79.

81.     The proprietary business, product and customer information of BPI constitute trade secrets because BPI derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

82.     BPI invested substantial time and millions of dollars in developing and maintaining its confidential and proprietary information. BPI's confidential and proprietary information is not known outside of BPI and could be learned by others, if at all, only by the expenditure of considerable time, effort and expense.

83. Satisfied and Kahan have actually misappropriated and/or threaten to inevitably misappropriate BPI's trade secrets without BPI's consent in violation of the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq*.

84. Satisfied and Kahan knew or had reason to know that information supplied to them, acted upon by them or forming the basis of their activities was utilized, removed improperly or derived from a person having a duty to maintain the secrecy of such information.

85. Satisfied and Kahan have been and/or will be unjustly enriched by the misappropriation of BPI's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate BPI's trade secrets and confidential information.

86. Satisfied's and Kahan's misappropriation has been wilful and malicious.

87. As a result of the misappropriation of BPI's trade secrets, BPI has been injured and/or Satisfied and Kahan have been individually, or in concert with others, unjustly enriched.

## COUNT III
### Tortious Interference with Existing Contract

88. BPI hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 87.

89. BPI entrusts its employees with confidential and proprietary information, in return for which it requires its employees to executed nondisclosure and confidentiality agreements, like the IDA entered in to by Lewis.

90. Satisfied and Kahan had full knowledge of the contractual relationship between BPI and Lewis.

13

91. Despite having knowledge of this contractual relationship, Satisfied and Kahan caused Lewis to breach his contractual obligations by funneling BPI's confidential and proprietary information to Satisfied and Kahan.

92. The interference by Satisfied and Kahan was willful and intentional.

93. This interference was accomplished by improper motive and through improper means.

94. By its conduct, Satisfied and Kahan intentionally interfered with BPI's existing contractual relationship with Lewis.

95. Satisfied's and Kahan's actions proximately damaged BPI, entitling BPI to recover compensatory and punitive damages.

## JURY DEMAND

96. Plaintiff requests a trial by jury.

**WHEREFORE**, BPI prays for the following relief:

a. That BPI be awarded the cost and expenses related to the lost investment in the development of the formulations and processes improperly received by Satisfied and Kahan;

b. That BPI be awarded compensatory damages in an amount to be proven at trial in excess of $75,000;

c. That BPI be awarded punitive and/or exemplary damages for willful and malicious conduct;

d. That BPI be awarded attorneys' fees and the costs of this action as permitted by law;

e. That BPI be awarded treble damages under 18 U.S.C. § 1964(c);

f. That Satisfied disgorge any monies obtained as a result of the improper actions alleged herein;

g. That Kahan disgorge any monies obtained as a result of his improper actions alleged herein;

    h.  That Satisfied be enjoined from utilizing or disclosing the proprietary and confidential information removed from BPI;

    i.  That Kahan be enjoined from utilizing or disclosing the proprietary and confidential information removed from BPI;

    j.  That Satisfied identify all third parties to whom it revealed BPI's confidential and proprietary information;

    k.  That Kahan identify all third parties to whom it revealed BPI's confidential and proprietary information; and

    l.  That BPI be awarded such other and further relief as the Court deems just and equitable.

Respectfully submitted,

BRAKE PARTS, INC.


By: _____
       One of Its Attorneys

Michael D. Wexler
Jason P. Stiehl
SEYFARTH SHAW LLP
131 S. Dearborn St., Ste. 2400
Chicago, Illinois 60603
(312) 460-5000

15

CH1 11839406.1